UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| WALLACE RAY RIFE, JR. | ) | |
| | ) | |
| V. | ) | NO. 2:11-CV-149 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is a judicial review of the administrative denial of the plaintiff's claim for Disability Insurance Benefits under the Social Security Act. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 7 and 11].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 45 years of age at the time of the denial of benefits by the Administrative Law Judge ["ALJ"]. His insured status for Disability Insurance Benefits expired on December 31, 2003, which means he must establish that he was disabled under the Act on or prior to that date. His application was filed on December 8, 2008, nearly 5 years after that insured states expired. He alleges disability due to musculoskeletal pain and a mental impairment.

The plaintiff was not represented by his present counsel until the filing of this action for judicial review. A significant problem throughout the administrative process was the timely production of medical and other records germane to plaintiff's claim. As will be seen, almost no relevant medical records were before the ALJ when he rendered his unfavorable decision on April 12, 2010. Records were presented to the Appeals Council by the plaintiff's former representative in June of 2010, but without any elaboration or argument. The Appeals Council denied his request for review on March 25, 2011.

**MEDICAL EVIDENCE BEFORE THE ALJ:**

Records were presented by the plaintiff from Dr. David Johnson, plaintiff's treating physician, who practices with Healthstar Physicians in Morristown, Tennessee, covering the period of time from March 31, 2006, through March 12, 2009. Plaintiff was diagnosed or

2

treated for myriad physical and mental ailments. These are described by plaintiff in his brief as: "generalized osteoarthritis, bilateral shoulder pain, hypogonadism, low blood pressure, malaise, osteoporosis, cervical disc disease, fatigue, weakness, joint pains, back pain, paresthesias, lack of energy, tinnitus, lumbar degenerative joint disease, degenerative disc disease, hemorrhoids, hypothyroidism, dizziness, muscle spasms, fibromyalgia, sleep apnea, hyperlipidemia, dyspnea on exertion, wheezing, headaches, upper respiratory infections, palpitations, dysuria, urinary frequency, allergic rhinitis, anxiety, depression, agitation, appetite loss, insomnia, bipolar disorder, and nervousness (Tr. 189-269, 293-379)." Doc. 8, pg. 2]. Of note is an x-ray report dated September 5, 2007, of the plaintiff's lumbosacral spine. It noted there was "very minimal dextroconvex lumbar scoliosis possibly due tat least in part to muscle spasm with no other evidence of lumbosacral pathology." (Tr. 267). X-rays of the thoracic spine taken the same day showed "moderate thoracic kyphosis with no other significant thoracic spinal pathology appreciated." (Tr. 268). The Court notes that these records do not appear to contain any reference to a mental condition such as depression or anxiety prior to 2007.

Dr. Johnson referred the plaintiff to Cherokee Health Systems in Morristown for his mental difficulties on December 1, 2008. He stated that his "symptoms began two years ago." (Tr. 273). On December 2nd, his Global Assessment of Functioning ["GAF"] was estimated at 42. (Tr. 272). At a visit on December 29, 2008, Plaintiff advised that he "has had depression for many years and took Zoloft successfully for over a year. Two years ago his depression and anxiety worsened." The impression was major depressive disorder recurrent and severe and agoraphobia with panic disorder. His GAF at that time was

3

estimated at 50. (Tr. 271).

State agency psychologists twice reviewed the medical records extant at that time and opined on February 24 and April 26, 2009, that there was insufficient evidence to determine whether plaintiff had a severe mental impairment at the time his insured status expired on December 31, 2003. (Tr. 275-288, 381). Two state agency physicians reached the same conclusion regarding his physical allegations (Tr. 289-292, 380).

The plaintiff was consultatively examined by psychologist Alice K. Garland on July 14, 2009 due to plaintiff's assertions of mental impairments. Plaintiff told her he cannot work because he cannot stand to be away from home, and that he had basically been home since 2006. He said "this problem started out with pain from degenerative disc disease and arthritis. He said his wanting to be at home was brought on by not working because he had always worked." He told her that "his first mental health treatment" was that at Cherokee Health Systems related above. (Tr. 393). Plaintiff advised that he worked from 2003 through 2006 doing auto body and detailing work, but "had to quit due to his health." He stated he had graduated from high school in regular classes but did not do well academically.

On mental status examination the plaintiff's affect was blunted and he seemed to be in pain. He said he sometimes had trouble with memory and concentration. He sometimes forgot where he put things. His though process was organized. He recalled three of three objects after five minutes and named four recent Presidents. He misspelled "world" backwards and miscalculated serial sevens and threes. She estimated the plaintiff had "low average" intelligence. He complained that he "feels worthless and hopeless because he is not able to do..." He said his "depression started this fall when the weather changed and his pain

4

went up." He said he would stay in bed three days at a time without showering, but that this was not as frequent now. (Tr. 394).

Plaintiff told Ms. Garland that his "panic attacks started years ago, but increased when he was diagnosed with fibromyalgia in the fall of 2008." He said "he gets scared, gets in bed and covers up." Plaintiff said he had no problems getting along with others and Ms. Garland said he "was pleasant," and had an "adequate" ability to relate to others. (Tr. 395).

IQ testing was performed by Ms. Garland. The scores yielded a Verbal IQ of 73, a Performance IQ of 70, and a Full Scale IQ of 69. She found this to be "somewhat of an anomaly as this is in the mildly mentally retarded range, but the Verbal and Performance IQs are in the borderline range." She stated that she "thought at times there may have been inconsistent effort on this test." She noted that on the reading portion of the test the plaintiff skipped easier words to say the word ceiling, diagram, exterior, triumph and efficiency. If he had read them, the reading score would have been 28 points higher. (Tr. 396).

A test to gauge malingering "did not in and of itself indicate malingering." (Tr. 397). She noted that there were some things the plaintiff told her, such as describing his earlier marijuana use, which he did not tell Cherokee Mental Health. Her diagnostic impression was "major depression disorder, recurrent? Moderate without psychotic features. Panic disorder with Agoraphobia-by the client's report. Rule out Personality Disorder, NOS.," and several medical problems outlined in the report. (Tr. 398).

Ms. Garland did a Medical Source Statement (Tr. 389-91). She stated that the plaintiff's abilities regarding understanding and carrying out instructions and making judgments at work were "difficult to determine- at times examiner thought client was not

putting forth consistently good effort." As for his abilities to deal with the public, supervisors, co-workers and responding appropriately to usual work situations and changes in routine, Ms. Garland rated plaintiff's problem as "extreme" which indicates "no useful ability to function in this area." She based this solely on "mental health records and client's self-report." Bear in mind that those "mental health records" were the records from Cherokee Health Systems describing his condition in December, 2008.

Plaintiff was also consultatively examined by Dr. Krish Purswani regarding his physical complaints. Dr. Purswani's examination is described in plaintiff's brief [Doc. 8, pgs. 4-5] as follows:

> Plaintiff underwent consultative exam by Dr. Krish Purswani on July 14, 2009. Presenting problems included a ten year history of low back pain secondary to degenerative disc disease, pain radiating to the right knee or ankle, a ten year history of neck and bilateral shoulder pain secondary to degenerative joint disease and fibromyalgia, bilateral hip pain, soreness in the hands and balls of the feet, and a six year history of nervousness. Plaintiff reported that he does not like to go out of the house without his wife; that he has anxiety attacks in crowds; that he has problems with depression and concentration; that he cries frequently; and that he was involved in a motor vehicle accident about five years prior which killed a person in the other car and he has not been the same since. The diagnoses were low back pain, degenerative disc disease, neck and shoulder pain, fibromyalgia, nervousness, moderate vision loss OD, tobacco abuse, and degenerative joint disease. In the body of his report, Dr. Purswani opined Plaintiff can frequently lift 40 pounds 2/3 of the time for a total of seven hours in an eight-hour day; can stand for seven hours per day and walk for seven hours per day for a total of seven hours in an eight-hour day; can sit for sight hours in an eight-hour day; and can manage his own affairs (Tr. 400-404).
> In a narrative report, Dr. Purswani opined Plaintiff's use of his hands and feet would be limited to force application of pushing, pulling, and operation of foot controls to 20 pounds per side, 40 pounds total; he should avoid unprotected heights and moving mechanical parts; and he would have a higher risk of accidents due to possibly reduced reaction time, unless he wears a harness or is otherwise adequately protected (Tr. 406). In the attached Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Purswani opined Plaintiff can frequently lift/carry a maximum of 50 pounds; can continuously lift/carry a maximum of 20 pounds; can sit for a total of eight hours in an eight-hour workday, three hours without interruption; can stand for a total of seven hours in an eight-hour workday, two hours without interruption; can walk for a total of seven hours in an eight-hour workday, one hour without interruption; can

6

frequently reach, handle, finger, feel, push/pull, operate foot controls, climb, balance, stoop, kneel, crouch, and crawl; and can never tolerate exposure to unprotected heights or moving mechanical parts (Tr. 405, 407-412).

Other records from Healthstar Physicians were also before the ALJ. (Tr. 413-35, 441-45, and 448-59). Included therein is a medical assessment by Dr. Johnson dated July 28, 2009 (Tr. 436-38). Dr. Johnson opined that the plaintiff could occasionally lift less than 10 pounds, was unable to lift any weight frequently; could walk for 5 hours in a workday, 30 minutes without interruption; could sit for 6 hours, 30 minutes without interruption; and had a host of postural and environmental limitations and restrictions.

Also in the record was a questionnaire prepared by the plaintiff's former representative with certain information filed out by Dr. Johnson (Tr. 446-47). In response to the question "what was Mr. Rife's medical condition in December of 2003," Dr. Johnson stated "degenerative disc disease lumbar." When asked "are Mr. Rife's alleged allegations [sic] normally expected from the type and severity of the diagnosis in his case," Dr. Johnson responded "yes." When asked "based on the medical records or your memory of Mr. Rife's condition, were there any physical limitations that you were aware of in December 2003, such as limitation in sitting, standing, or lifting," Dr. Johnson replied "prolonged standing, walking, lifting > 20 pounds." When asked if he had any other comments regarding plaintiff's medical condition in December of 2003, Dr. Johnson stated "condition largely unchanged."

Also placed in the record before the ALJ by plaintiff's former representative were high school records from Burch High in Delbarton, West Virginia for "Wallace Ray Rife." The date of birth for the individual was listed as June 26, 1944, and a photograph was

included. (Tr. 439-40). These records, after the ALJ had rendered his decision, were finally determined to be those of the plaintiff's father. Plaintiff's records were submitted after the ALJ rendered his decision, being added to the record on June 10, 2010. Plaintiff passed and graduated, with several poor grades in many subjects (but not all by any means) with an overall GPA of 1.70, graduating 58th out of 69. (Tr. 592).

At the administrative hearing, the plaintiff testified that he had been under Dr. Johnson's care for at least 10 years. His former representative stated that they were unable to get plaintiff's medical records earlier than March 31, 2006 because they were "in storage" and "they just can't get them for some reason." (Tr. 25-26).

In his hearing decision, the ALJ first noted that the plaintiff had the burden of proving that he was disabled as of the date his insured status expired, December 31, 2003. He stated then that the "through the date last insured, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment." (Tr. 13). The ALJ said that the plaintiff alleged disability beginning December 1, 2003 (just 30 days before the expiration of his insured status) due to degenerative disc disease, osteoporosis, bipolar disorder, agoraphobia and depression. After pointing out the lack of any medical records from before the expiration date, the ALJ noted that "although there is objective medical evidence beginning in November 2006, this does not relate back to the date when the claimant was last insured for Disability Insurance Benefits." (Tr. 14).

The ALJ then discussed the evidence in the record beginning with Ms. Garland's examination. The ALJ, referring to the school records which no one had yet noticed were for someone born 20 years before the plaintiff, stated that plaintiff's "IQ scores achieved on

8

current testing are not consistent with his academic performance as reflected in his school records contained in the record." He did not mention the questionnaire completed by Dr. Johnson at Tr. 446-47. He found that the plaintiff did not have a severe impairment as of the time his insured status expired because "there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment through the date last insured." (Tr. 14). Accordingly, he found that the plaintiff was not disabled. (Tr. 15).

After the matter was appealed, plaintiff finally obtained the records of Dr. Johnson from December 4, 2001 through March 3, 2006. (Tr. 459-586). These records show extensive treatment for complaints of pain from degenerative disc disease before and after the date the plaintiff's insured status expired. However, there are also several objective studies which do not show seriously abnormal findings. These are summarized in the Commissioner's brief, Doc. 12, pg. 11, as follows:

> A CT scan of Plaintiff's lumbar spine dated May 20, 2002, demonstrated intact vertebral discs with no significant bulging (Tr. 564). The impression was negative CT scan of the lumbar spine (Tr. 564). Antinuclear antibody or ANA testing dated August 7, 2003, was also negative (Tr. 567). Sedimentation rate and Rh factor testing were also in the normal range (Tr. 568). Drug testing was positive for marijuana (Tr. 569). A Cervical spine x-ray dated July 19, 2004, after the expiration of Plaintiff's insured status showed relatively preserved disc spaces (Tr. 570). The soft tissues were normal (Tr. 570). There was no bony abnormality (Tr. 570). Findings suggested but did not confirm the presence of muscle spasm (Tr. 570).

The Appeals Council denied the plaintiff's request for review. It stated basically that it had looked at the long lost medical records from Dr. Johnson and the school records and determined it "found no reason under our rules to review" the ALJ's hearing decision. (Tr. 1).

Plaintiff first argues that the ALJ erred in failing to find that the plaintiff suffered from

9

a severe impairment prior to the expiration of his insured status. The Sixth Circuit has held "[w]e have construed the step two severity regulation as a 'de minimis hurdle' in the disability determination process." *Griffeth v. Commisisoner* 217 Fed. Appx. 425, 428 (6th Cir. 2007) citing *Higgs v. Bowen*, 880 F.ed 860, 862 (6th Cir. 1988). He then refers to the questionnaire completed by the plaintiff's former representative and filled out by Dr. Johnson (Tr. 446-47), pointing out that the ALJ did not discuss or even refer to that document, much less provide any reasons for its rejection. Plaintiff continues this argument by noting the great weight to be accorded to the medical opinions and diagnoses of treating physicians, arguing that Dr. Johnson should be accorded "controlling weight."

Plaintiff next argues that the ALJ erred in failing to consider whether plaintiff met or equaled Listing 12.05C on mental retardation, which mandates a finding of disability if a person has "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." The "deficits in adaptive functioning" must have "initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Here, plaintiff asserts that since the IQ test administered by Ms. Garland showed a Full Scale IQ of 69, and since the plaintiff has another severe impairment, he meets the listing. He asserts that the corrected school record shows he had this condition before age 22.

Lastly, he asks, alternatively, that the Court remand his case to consider the "new evidence which arose since the ALJ denied this claim." Here, plaintiff is speaking of the school records and, of course, Dr. Johnson's records beginning in 2001.

10

Case 2:11-cv-00149-JRG-DHI   Document 13   Filed 08/15/12   Page 10 of 13   PageID #: 80

The Court finds very little fault with the ALJ's reasoning. Plaintiff waited for almost 5 years after his insured status expired before filing his claim. His former representative also failed to provide any medical records that were generated less than two years after the expiration of his insured status, save one. The Court cannot ignore the questionnaire completed by Dr. Johnson which said that the plaintiff, in December of 2003, before his insured status expired, had substantial limitations in his ability to engage in prolonged standing, walking or lifting more than 20 pounds. And the Court cannot ignore the fact that the ALJ did not analyze it, attempt to discount it, or mention it at all. Even the lack of weight given to a bald assertion by a treating physician must be explained by the Commissioner. *See, Hensley v. Astrue* 573 F. 3d 263 (6th Cir. 2009), *Wilson v. Commissioner*, 378 F.3d 541 (6th Cir. 2004).

We are not considering the weight accorded to a treating physician's opinion where it is unsupported by medical findings and tests, but whether the de minimis standard is met. At the time of the ALJ's decision, there were no contemporaneous office records from Dr. Johnson in the record to support his opinion contained in the terse questionnaire. However now, the record does contain his treatment notes which document treatment for the plaintiff's degenerative disc disease and arthritis with strong medications such as Lortab, and very frequent visits for the same complaints of musculoskeletal pain. To be sure, there are objective findings from x-rays which show minimal pathology, as well as the opinion of Dr. Purswani of a much great residual functional capacity *now* than that ascribed to the plaintiff in 2003 by Dr. Johnson. But we are not talking about the extent of the plaintiff's limitations, or jobs he might perform with those limitations, but whether he presented evidence of a

11

severe impairment. In fact he did.

In the opinion of this Court, the case should be remanded with respect to plaintiff's physical impairment to determine his RFC and whether there are jobs he can perform. It is also the opinion of the Court that failing to address Dr. Johnson's opinion was not substantially justified under the case law and regulations.

As for the meeting of the listing, contrary to plaintiff's brief, Ms. Garland had extreme difficulty in accepting the Full Scale IQ of 69, and pointed out reasons why she doubted it, such as a perceived lack of effort and him skipping over simple words while breezing through reading more complicated words. Also, the correct school records show a student towards the tail end of his class, but certainly do not show, as a matter of law, that he was mildly retarded at that time. There are no records of any diagnosis of severe mental impairments in Dr. Johnson's records, or other records, until long after the plaintiff's insured status had expired.

The Court is of the opinion that there is substantial evidence to support the ALJ's finding that plaintiff did not have a severe mental impairment at the time his insured status expired.

It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 7] be GRANTED with respect to remanding the case to further consider the plaintiff's physical impairments, and DENIED with respect to the plaintiff's alleged mental impairments. It is further recommended that the defendant Commissioner's Motion for Summary Judgment [Doc. 11] be DENIED as to the plaintiff's physical

impairments and GRANTED with respect to his mental impairments.[1]

                          Respectfully submitted:

                            s/ Dennis H. Inman
                          United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

13